IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 06-291 (JDB) |
| | : | |
| v. | : | |
| | : | FILED |
| MOJTADA MALEKI-GOMI, | : | |
| also known as Moji Maleki, | : | NOV 1 9 2007 |
| BABAK MALEKI, | : | |
| also known as Bobby Maleki, | : | NANCY MAYER WHITTINGTON, CLERK |
| SHAHRAM SETUDEH NEJAD, | : | U.S. DISTRICT COURT |
| also known as Shawn Nejad, | : | |
| | : | |
| Defendants. | : | |

## FACTUAL PROFFER IN SUPPORT OF GUILTY PLEA

1.  Defendants Mojtada Maleki-Gomi and Babak Maleki did business as M&M Investment Co. ("M&M"), with an office at 260 South Beverly Drive, Beverly Hills, California. The principal line of business for M&M was the sale of textile machinery, both domestically and abroad. As of June 2005, M&M was advertising on the internet a type of textile equipment known as a Knit-de-Knit ("KDK") machine. The ad listed Babak Maleki as the point of contact for the KDK machines and gave a telephone number for him.

2.  A cooperating source, using the alias "Amin Alvandi," called the phone number for Babak Maleki and left several messages. On July 12, 2005, defendant Shahram Nejad returned Alvandi's calls and left a message for him. On July 15, 2005, Mr. Nejad and Alvandi spoke with each other over the telephone. During their conversation, Alvandi told Mr. Nejad that he was looking to buy 30 KDK machines and to ship them to Iran. In a followup telephone conversation on July 25, 2005, Alvandi and Mr. Nejad again discussed Iran as the final

destination of the KDK machinery. On July 25, 2005, Alvandi also introduced an undercover agent, who was using the alias "Sami Adaham," to Mr. Nejad over the telephone.

3. On August 4, 2005, Adaham traveled to Los Angeles, California, to view the KDK machinery. When he arrived at the location where Mr. Nejad had told him the KDK equipment was being stored, a man who called himself "John" showed the machinery to Adaham. After viewing the products, Adaham telephoned Mr. Nejad to discuss pricing for the equipment and for shipping it to Iran. During the conversation, Mr. Nejad told him that the cost of the equipment (30 pieces) was "$21,000, something in that range for these machines" and that "$7,000 will cost to deliver it to Tehran, more or less."

4. On August 24, 2005, Adaham had a telephone conversation with Mojtada Maleki-Gomi. During this conversation, Adaham and Mr. Maleki-Gomi discussed the proposed sale of the KDK machinery and the shipment of the products to Iran. Mr. Maleki-Gomi explained to Adaham that, in order to avoid problems with U.S. Customs, it would be necessary to ship the goods first to Dubai and then to Iran. Mr. Maleki-Gomi also told Adaham that he would provide him with a purchase order for the goods that would purport to show a company in Dubai as the recipient of the machines.

5. On September 8, 2005, Mr. Nejad sent an e-mail to Adaham that contained, as an attachment, the purchase order that Mr. Maleki-Gomi had described to Adaham during their August 24, 2005, conversation. The purchase order listed as the vendor "AEC L.L.C., P.O. Box 116490, Dubai - United Arab Emirates" instead of M&M. It also falsely listed the consignee as "AEC L.L.C., P.O. Box 116490, Dubai - United Arab Emirates." The purchase order further falsely claimed that the $7,000 shipping cost was for "shipment to U.A.E."

6. On September 21, 2005, Adaham met with Mr. Maleki-Gomi in Los Angeles, California. During the meeting, Mr. Maleki-Gomi again described how he was able to get products to Iran through Dubai and how, for this particular transaction, he would arrange for the shipment of the goods from Dubai to Bandar Abbas, Iran.

7. On October 4, 2005, government agents wired $2,800 to Account No. 0360003264 at the Union California Bank. These funds were a down payment for the purchase of the KDK machinery and for their transport to Iran.

8. On November 18, 2005, Adaham called Mr. Nejad to inquire about a delay in the shipment of the KDK equipment. Mr. Nejad gave Adaham the following explanation, which he had received from Mr. Maleki-Gomi:

> He explained the situation that, as you know, selling this stuff to certain destinations that are not legal. So basically there are a few companies who handle these kinds of things. So it has to go to Dubai and then to the office of the final destination. That's why everything has been taking so long.

9. On December 5, 2005, Mr. Nejad sent an e-mail to Adaham informing him that the KDK machinery had been put in a container and that the shipping company had placed the container on a ship. Mr. Nejad also attached to the e-mail the bill of lading that the shipping company had prepared. On December 7, 2005, the container of KDK machinery left the Port of Los Angeles for Dubai. United States Customs and Border Protection ("CBP") subsequently ordered that the container be removed from the ship and returned to Los Angeles, where it was detained.

10. On December 13, 2005, Adaham met with Babak Maleki in Los Angeles. At the meeting, Mr. Maleki accepted from Adaham a cashier's check in the amount of $25,200, which

represented the outstanding balance for the purchase of the KDK equipment. During this meeting, Mr. Maleki described to Adaham how the process of transshipping the KDK machinery to Iran through Dubai worked by "just chang[ing] the paperwork." Mr. Maleki also warned Adaham not to disclose to any representatives of the shipping company in the United States that Iran was the final destination of the products, saying, "Whatever you do, don't tell any of these guys where it's going . . . No, never, because they all think it's going to Dubai."

11.     On January 4, 2006, Mr. Maleki had a telephone conversation with a CBP officer concerning the detained container of KDK equipment. During the conversation, as part of his efforts to secure release of the container, Mr. Maleki falsely represented to the CBP officer that the ultimate destination of the container was the United Arab Emirates and that the container would not be transshipped to any other country from the U.A.E.

12.     On July 18, 2006, Mr. Nejad met with agents at the CBP office in Long Beach, California. Mr. Maleki participated in the meeting by telephone. During the meeting, Mr. Nejad falsely told the agents that M&M was the owner of the machinery and that "[t]o the best of [his] understanding" the ultimate destination of the machines was Dubai. Mr. Maleki also falsely represented to the agents that M&M had sold the KDK equipment to a company in Dubai called AES and that the goods would remain in Dubai and not be transshipped to Iran. As a follow-up to the meeting, on July 26, 2006, Mr. Nejad and Mr. Maleki sent a letter to CBP falsely claiming that the purchaser of the KDK machines was "AEC Electronic LLC, P.O. Box 115490, 310-3, Third Floor, Khaleej Center, Bur Dubai, U.A.E."

13.     In November 2004, an agent with the Department of Commerce made a visit to M&M and met with Mr. Maleki. During the visit, the agent reviewed with Mr. Maleki the

various export restrictions the U.S. imposes on exporters, including the Iranian sanctions. The agent also left literature on the sanctions with Mr. Maleki.

14.  On March 11, 2005, CBP did a secondary interview of Mr. Maleki-Gomi when he re-entered the country at Los Angeles International Airport. During the interview, Mr. Maleki-Gomi informed the CBP officers that he had visited Iran while he was outside the United States. When they asked him about his knowledge of the Iranian Transactions Regulations, he stated that he was very familiar with them, that he knew the date of their inception, and that he was even familiar with some of the less well-known restrictions such as the prohibition against brokering. The officers offered Mr. Maleki-Gomi a pamphlet on the Iranian Transactions Regulations, but he declined it, saying he knew all the details of the sanctions program against Iran.

## DEFENDANT'S ACKNOWLEDGMENT

I have read and discussed this Factual Proffer in Support of Guilty Plea fully with my attorneys, G. Allen Dale and Danny Onorato. I agree, and acknowledge by my signature, that paragraphs 1, 4, 6, 7, 8, 9, and 14 of this proffer of facts are true and accurate for the purpose of the plea of guilty in this case.

Date: 11/19/07

_____
Mojtada Maleki-Gomi
Defendant

Date: 11/19/07

_____
G. Allen Dale, Esq.
Attorney for Mojtada Maleki-Gomi

Date: 11/19/07

_____

                    Danny Onorato
                    Attorney for Mojtada Maleki-Gomi

## DEFENDANT'S ACKNOWLEDGMENT

I have read and discussed this Factual Proffer in Support of Guilty Plea fully with my attorney, Donald Ré. I agree, and acknowledge by my signature, that paragraphs 1, 7, 9, 10, 11, 12, and 13 of this proffer of facts are true and accurate for the purpose of the plea of guilty in this case.

Date: 11-19-07

_____
Babak Maleki
Defendant

Date: 11 19 07

_____
Donald Ré, Esq.
Attorney for Babak Maleki

## DEFENDANT'S ACKNOWLEDGMENT

I have read and discussed this Factual Proffer in Support of Guilty Plea fully with my attorney, A. J. Kramer. I agree, and acknowledge by my signature, that paragraphs 1, 2, 3, 5, 6, 7, 8, 9, and 12 of this proffer of facts are true and accurate for the purpose of the plea of guilty in this case.

Date: NOV, 19, 07

_____
Shahram Setudeh Nejad
Defendant

-6-

Date: 11.19.07

_____
A. J. Kramer, Esq.
Attorney for Shahram Setudeh Nejad